**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

MIDWEST DIRECT LOGISTICS, INC.,

        Plaintiff,

vs.

TWIN CITIES TANNING
WATERLOO, LLC,

        Defendant.

No. 15-CV-2013-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

I.     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    *RELEVANT PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . **2**

III.   *SUBJECT MATTER JURISDICTION* . . . . . . . . . . . . . . . . . . . . . . . . **3**

IV.   *SUMMARY JUDGMENT STANDARD* . . . . . . . . . . . . . . . . . . . . . . . . **3**

V.    *RELEVANT FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . **4**

      *A.*   *Parties & Players* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
      *B.*   *Business Relationship* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
      *C.*   *Bills of Lading*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
      *D.*   *Atlantic's Financial Troubles* . . . . . . . . . . . . . . . . . . . . . . . . **8**

VI.   *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

      *A.*   *Proper Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**
          *1.*   *Whether TCTW is the shipper/consignor* . . . . . . . . . . . . . **12**
          *2.*   *Whether Midwest is the carrier*  . . . . . . . . . . . . . . . . . . . **14**
      *B.*   *Bills of Lading as Freight Contracts* . . . . . . . . . . . . . . . . . . . **16**
          *1.*   **Thunderbird** *and* **Bestway** . . . . . . . . . . . . . . . . . . . . . . **19**

      2.     ***TCTW's interest in the hide trimmings*** . . . . . . . . . . . . . . . **21**
      3.     ***Atlantic's purported agreement to pay*** . . . . . . . . . . . . . . . . **23**
    *C.*    ***Equitable Estoppel*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

*VII.*  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

## *I. INTRODUCTION*

The matters before the court are Plaintiff Midwest Direct Logistics, Inc.'s ("Midwest") "Motion for Summary Judgment" ("Midwest Motion") (docket no. 35) and Defendant Twin City Tanning Waterloo, LLC's ("TCTW") "Motion for Summary Judgment" ("TCTW Motion") (docket no. 36).

## *II. RELEVANT PROCEDURAL HISTORY*

On October 2, 2015, Midwest filed an Amended Complaint (docket no. 21). The Amended Complaint sets forth two claims. Count I alleges that TCTW breached express contracts it made with Midwest in the form of bills of lading, entitling Midwest to recover the cost of shipping goods from TCTW to a third party. Count II alleges that TCTW breached implied contracts it made with Midwest wherein TCTW agreed to pay Midwest the reasonable value of the shipping services that Midwest provided to TCTW. On April 19, 2016, TCTW filed an Answer (docket no. 32) in which TCTW denies liability on both counts.[1]

On May 13, 2016, Midwest filed the Midwest Motion. On May 17, 2016, TCTW filed the TCTW Motion. On June 6, 2016, TCTW filed a resistance to the Midwest Motion ("TCTW Resistance") (docket no. 37). On June 8, 2016, Midwest filed a

---

[1] On July 4, 2015, TCTW filed a Motion in Support of Jury Demand (docket no 14), requesting a jury trial. Though Midwest resisted TCTW's jury demand, United States Chief Magistrate Judge Jon S. Scoles granted the Motion in Support of Jury Demand on August 3, 2015. *See* Aug. 3, 2015 Order (docket no. 17). Any claims surviving summary judgment shall proceed to trial before a jury.

resistance to the TCTW Motion ("Midwest Resistance") (docket no. 38). On June 15, 2016, TCTW filed a reply ("TCTW Reply") (docket no. 39). On June 16, 2016, Midwest filed a reply ("Midwest Reply") (docket no. 40). TCTW requests oral argument on both the Midwest Motion and the TCTW Motion, but the court finds that oral argument is unnecessary. The Midwest Motion and the TCTW Motion are fully submitted and ready for decision.

## III. SUBJECT MATTER JURISDICTION

The court has original jurisdiction over the instant action because complete diversity exists between the parties and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332 ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States . . . .").

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show'" an absence of a genuine dispute as to a material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Fed. R. Civ. P. 56(c)(2)). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson*, 643 F.3d at 1042 (alterations in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986)). Once the movant has done so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324).

On a motion for summary judgment, the court must view the facts "in the light most favorable to the nonmoving party." *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment is appropriate. *Ricci*, 557 U.S. at 586 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts . . . .'" *Torgerson*, 643 F.3d at 1042 (quoting *Matsushita*, 475 U.S. at 586). Instead, "[t]o survive a motion for summary judgment, the nonmoving party must substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (second and third alterations in original) (internal quotation marks omitted) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)). Mere "self-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r*, 614 F.3d 799, 807 (8th Cir. 2010).

## V. *RELEVANT FACTUAL BACKGROUND*

### A. *Parties and Players*

Midwest is a corporation organized and existing under the laws of the state of Michigan with its principal place of business in Coopersville, Michigan. Amended Complaint ¶ 5. TCTW is a limited liability company organized and existing under the laws of the state of Iowa with its principal place of business in Waterloo, Iowa. *Id.* ¶ 6.

Kraft Foods, Inc. ("Kraft") is a corporation that purchased truckloads of animal hide trimmings, the commodities at issue in the instant action. *Id.* ¶ 7. Atlantic Trading

Corporation ("Atlantic") was a company that functioned as a purchasing service for Kraft. TCTW Statement of Facts (docket no. 36-2) ¶ 5. Atlantic has since gone out of business. *Id*. ¶ 7. Twin City Hide, Inc. ("Twin City Hide") is a corporation organized and existing under the laws of the state of Minnesota that provided raw hides to TCTW, its contract tanner, for processing. *See id*. ¶¶ 6, 8; Response to TCTW Statement of Facts (docket no. 38-1) ¶¶ 6, 8. Twin City Hide is TCTW's corporate parent, the latter being a wholly owned subsidiary of the former. Midwest Statement of Facts (docket no. 35-2) ¶ 56; Response to Midwest Statement of Facts (docket no. 37-1) ¶ 56.

### B. Business Relationship

The above-mentioned companies engaged in business regarding the preparation, sale and shipment of animal hides and hide trimmings. Twin City Hide sent raw hides to TCTW for processing and tanning. *See* TCTW Statement of Facts ¶ 8; Response to TCTW Statement of Facts ¶¶ 8-9; "Defendant's Appendix in Support of Motion for Summary Judgment" ("TCTW App'x") (docket no. 36-3) at 55 (an owner of Twin City Hide describing TCTW as a "contract tannery" where Twin City Hide sent its own hides to get processed). TCTW trimmed the undesirable pieces from the hides and placed the trimmed pieces in tubs. Once TCTW accumulated eight or nine tubs, or roughly 44,000-45,000 pounds of hide trimmings, they would be sold. *See* "Plaintiff's Appendix in Support of Motion for Summary Judgment" ("Midwest App'x") (docket no. 35-3) at 21-22. When a shipment of hide trimmings was ready to be sold, TCTW would contact Michael Lerner, one of the owners of Atlantic, and tell him that a shipment was ready. *See id*. at 26-28. Twin City Hide would send an invoice to Atlantic, and Atlantic would write a check to Twin City Hide for the hide trimmings. *See* TCTW App'x at 48. Atlantic would then contact Midwest and arrange for shipment of the hide trimmings from TCTW to Kraft in Woburn, Massachusetts. *See* TCTW Statement of Facts ¶ 13.

After Atlantic informed Midwest that a shipment was ready to be picked up, Midwest would enter the order in its computer system, find a third-party carrier to haul the shipment to Kraft and then dispatch a truck to do so. Midwest Statement of Facts ¶ 4. When the truck arrived at TCTW, the employees at TCTW would help load the shipment of hide trimmings. Midwest App'x at 27. Volker Roos, one of TCTW's employees and 30(b)(6) representatives, prepared bills of lading for each of the twenty-seven shipments at issue. *Id.* at 22. Roos would prepare the bills of lading on TCTW's computer system. The form for the bills of lading was already on the computer and Roos would simply fill in the relevant information fields and print a hard copy of the bill of lading for the driver. *Id.* ("[The bills of lading are] already on the computer system. I just generate it off the computer system, put all the information in there and print it off."). Roos did not sign the bills of lading because he was told that it was not necessary to do so. *Id.* Roos would then provide the bills of lading to the truck drivers. *Id.* at 29. Sometimes, the driver would sign the bill of lading. TCTW Statement of Facts ¶ 13; Response to TCTW Statement of Facts ¶ 13. Upon delivery, a representative from Kraft would sign the bill of lading. TCTW Statement of Facts ¶ 13. Then, the third-party trucking company would forward the original bill of lading to Midwest. Midwest App'x at 15.

Midwest paid the third-party trucking company at the time the truck was dispatched. Midwest Statement of Facts ¶ 5; Midwest App'x at 9. After the truck was dispatched, the order was sent to billing and a bill was prepared and sent to Atlantic for payment. Midwest Statement of Facts ¶ 5; Midwest App'x at 9. At issue in the instant action are twenty-seven shipments of hide trimmings for which Midwest has not been paid. The price of freight was always negotiated solely between Atlantic and Midwest—TCTW never participated in coordinating shipping arrangements or negotiated price. TCTW Statement of Facts ¶¶ 11-12. Midwest did not own any trucks directly, but acted as a brokerage company and coordinated freight. *Id.* ¶ 2. Atlantic and Midwest had a business

relationship lasting for more than six years. *See* TCTW App'x at 3. TCTW was never billed for the shipments and never paid for any of the shipments. TCTW Statement of Facts ¶¶ 10, 15. It was not Midwest's practice to send accounting records or freight bills to TCTW or Twin City Hide. *Id.* ¶ 18.

## C. Bills of Lading

Each bill of lading at issue in the instant action contains the following language:

> Shipper hereby certifies that he is familiar with all of the terms and conditions of the said bill of lading, including those on the back hereof, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

Midwest Statement of Facts ¶ 30.[2] The bills also provide that "every service to be performed [t]hereunder shall be subject [to] all the terms and conditions of the Uniform Domestic Straight Bill of Lading . . . ." *Id.* Each bill of lading also contains the following language:

> Subject to Section 7 of Conditions of Applicable Bill of Lading, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:

> The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

*Id.* ¶ 31 (formatting omitted). A signature line appears below the above provision. Neither Roos nor any other representative from TCTW signed below the Section 7

---

[2] Midwest has provided copies of the bills of lading at issue in the instant action. *See* Midwest App'x at 47-100; *see also* Amended Complaint at 7-33. The copies provided to the court are largely illegible. However, because the parties do not dispute that the language reproduced in this section appears in the bills of lading, the court shall accept the language quoted in the Midwest Statement of Facts as true for purposes of summary judgment.

provision. *Id.* ¶ 29. Despite making reference to "the back" of the bills, additional terms and conditions were not included on the back of the bills of lading in question. *Id.* ¶ 32.

The bills of lading themselves do not set forth any shipping rate. TCTW Statement of Facts ¶ 34. Midwest is not identified anywhere on the bills of lading—instead, the "delivering carrier" on the bills is identified by the name of the third-party trucking company that Midwest arranged to carry the hide trimmings or the name of the truck driver. *Id.* ¶¶ 34-35. The "shipper" identified on the bills of lading is "Twin City Tanning Co., LLP." *See* Midwest App'x at 47-100; *see also* Amended Complaint at 7-33.[3] Finally, the bills identify the shipments as originating from TCTW. *See* Midwest App'x at 47-100; *see also* Amended Complaint at 7-33.

### D. Atlantic's Financial Troubles

Throughout Atlantic and Midwest's relationship, there were certain periods wherein Atlantic would fall behind on its payments. This was concerning to Midwest who, on at least one occasion, refused to make any more shipments until Atlantic became current on its account. TCTW Statement of Facts ¶ 15. By late 2013, Atlantic had fallen significantly behind and Midwest was placing pressure on Atlantic to pay. *Id.* ¶ 23. At that time, Midwest's bank was scrutinizing its account with Atlantic and pushing Midwest to collect on the account or to stop doing business with Atlantic. *Id.* ¶ 24.

On December 29, 2013, Midwest sent the following email to Lerner:

> Mike, I am being asked if this account is collectible by the bank and our partner. At this point not sure how to answer them. We will begin billing the shipper as well as Kraft Foods for all outstanding invoices on Monday morning.

---

[3] TCTW claims that the identified "shipper" on the bills is "Twin City Tanning Company, LLP," as opposed to "Twin City Tanning Co., LLP." TCTW Statement of Facts ¶ 37. Midwest does not dispute that the "shipper" identified on the bills of lading is "Twin City Tanning Co., LLP" and its arguments regarding the proper parties to the lawsuit are addressed below.

Midwest App'x at 18 (formatting omitted). Lerner responded that he would be forwarding payment soon, and that he is "responsible for the shipping not [Kraft] nor the shippers." *Id.* at 17. Midwest ceased doing business with Atlantic in late December of 2013. TCTW Statement of Facts ¶ 27.

Twin City Hide never received payment from Atlantic for the twenty-seven shipments at issue in the instant action. Midwest Statement of Facts ¶ 63. Midwest has not been paid for the twenty-seven shipments either. Atlantic went out of business in the Spring of 2014. TCTW Statement of Facts ¶ 7. Prior to the initiation of the instant action, Midwest never sent any invoices or notices of late payment to TCTW. *Id.* ¶ 18. It is undisputed that Midwest never contacted TCTW about Atlantic's financial troubles because Midwest viewed TCTW as Atlantic's customer. *Id.* ¶ 33. In fact, prior to Atlantic's financial troubles, Midwest never considered that TCTW might be liable for the freight charges. *Id.* ¶ 19. Only after Craig Warner, one of Midwest's partners, investigated the bills of lading and discovered that Section 7 had not been signed by TCTW did Midwest believe that TCTW was liable for the freight charges. *Id.* ¶ 19; TCTW App'x at 31. Midwest initiated the instant action to attempt to collect the freight charges that it can no longer collect from Atlantic.

## VI. ANALYSIS

Midwest argues that summary judgment in its favor is appropriate because TCTW issued the bills of lading without signing the nonrecourse provision, thereby creating express contracts and assuming liability for the cost of shipping the twenty–seven loads in question. Brief in Support of the Midwest Motion (docket no. 35-1) at 6. TCTW argues that it is entitled to summary judgment because it is not the shipper and Midwest is not the carrier, as provided in the bill of lading. Brief in Support of the TCTW Motion (docket no. 36-1) at 12; TCTW Resistance at 7. It also argues that the bills of lading functioned only as receipts, and not as contracts allocating liability for shipping charges. Brief in

Support of the TCTW Motion at 10. TCTW further argues that, even if TCTW is the shipper, TCTW had no interest in the hide trimmings and the parties all agreed that Atlantic would be solely liable for the cost of freight. *Id.* at 13, 15. Finally, TCTW argues that Midwest is estopped from enforcing any rights created under the bills of lading because it acted in a manner inconsistent with the existence of a contract between itself and TCTW by seeking to collect from Atlantic. *Id.* at 18-19.

Bills of lading serve a dual function as both a receipt demonstrating the transport of goods and as evidence of the contract of carriage. *See Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 94 (2010) ("A bill of lading 'records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage.'" (quoting *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 18-19 (2004)); *S. Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 342 (1982) ("The bill of lading is the basic transportation contract between the shipper-consignor and the carrier; its terms and conditions bind the shipper and all connecting carriers."). "Since the bill of lading is a contract of carriage between shipper and carrier, familiar principles of contract interpretation govern its construction." *Starrag v. Maersk, Inc.*, 486 F.3d 607, 616 (9th Cir. 2007). Accordingly, the "scope and effect" of bills of lading are governed by the intent of the parties. *Mexican Light & Power Co. v. Pa. R.R. Co.*, 33 F. Supp. 483, 484 (E.D. Pa. 1940). Such intent is primarily determined by "the form in which the contract has been cast," but the "facts and circumstances surrounding the issue" can also demonstrate the parties' intent. *Id.*; *see also Pillsbury Co., Inc. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008) ("The cardinal rule of contract interpretation is to determine what the intent of the parties was at the time they entered into the contract. Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." (quotation marks and citations omitted)).

Under the default terms of a bill of lading, "the consignor remains primarily liable for the freight charges." *S. Pac. Transp. Co.*, 456 U.S. at 343. The term "consignor" is defined by statute as "the person named in a bill of lading as the person from whom . . . goods have been received for shipment." 49 U.S.C. § 80101(2). "[U]nless [the consignor] is specifically exempted by the provisions of the bill of lading, or unless the goods are received and transported under such circumstances as to clearly indicate an exemption for him, the carrier is entitled to look to the consignor for his charges." *S. Pac. Transp. Co.*, 456 U.S. at 343 (quoting In re *Bills of Lading*, 52 I.C.C. 671, 721 (1919), *modified*, 64 I.C.C. 357 (1921), *further modified*, 66 I.C.C. 63 (1922)). Generally, a consignor can avoid liability for the cost of freight by endorsing the Section 7 nonrecourse provision on the bills of lading. "If the nonrecourse clause is signed by the consignor and no provision is made for the payment of freight, delivery of the shipment to the consignee relieves the consignor of liability." *Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co.*, 513 F.3d 949, 955 (9th Cir. 2008) (quoting *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 478-79 (9th Cir. 2000)). If a consignor fails to sign the nonrecourse provision of the bill of lading, the consignor is presumptively liable for the cost of freight. *See Louisville & Nashville R.R. Co. v Central Iron & Coal Co.*, 265 U.S. 59, 67 (1924).

> But this inference may be rebutted, as in the case of other contracts. It may be shown, by the bill of lading or otherwise, that the shipper of the goods was not acting on his own behalf; that this fact was known by the carrier; that the parties intended not only that the consignee should assume an obligation to pay the freight charges, but that the shipper should not assume any liability whatsoever therefor; or that he should assume only a secondary liability.

*Id.* at 67-68.

The court shall first address whether TCTW and Midwest are the proper parties to the instant action. It shall then consider whether TCTW is presumptively liable for freight

under the bills of lading and, if it is, whether one of the exceptions to the default rule applies. Finally, the court shall consider whether Midwest is equitably estopped from pursing its claims.[4]

## A.  Proper Parties

TCTW argues that it is entitled to summary judgment because it is not the "shipper" under the bills of lading. TCTW also resists the Midwest Motion on the ground that Midwest is not the "carrier" under the bills of lading. The court shall address each argument separately.

### 1.    Whether TCTW is the shipper/consignor

TCTW argues that it "is not designated as the 'shipper' on any of the bills of lading." Brief in Support of the TCTW Motion at 12. Instead, the bills of lading identify a "wholly distinct legal entity" as the shipper—"Twin City Tanning Co[.], LLP." *Id.*; *see also* Midwest App'x at 47-100; Amended Complaint at 7-33. TCTW argues that "Midwest never asserted a piercing theory or articulated a reason to ignore the separate"

---

[4] The court notes that neither party argues which state's laws apply to the instant action. Because the court's jurisdiction rests on diversity of the parties, the court must determine which state's laws apply. "Federal courts sitting in diversity apply the choice-of-law rules of the forum state." *Eagle Tech. v. Expander Ams., Inc.*, 783 F.3d 1131, 1137 (8th Cir. 2015). Iowa courts apply the "most-significant-relationship" test, espoused by the Restatement (Second) of Conflict of Laws, to determine which forum's laws to apply in contract disputes. *See Moad v. Dakota Truck Underwriters*, 831 N.W.2d 111, 118 (Iowa 2013). Courts look to several factors in determining which forum's laws to apply, including: the forum in which the contract was formed and executed; the forum in which the parties expect performance to take place; the location of the contract's subject matter; and the domiciles of the parties. *See First Midwest Corp. v. Corp. Fin. Assocs.*, 663 N.W.2d 888, 893 (Iowa 2003); Restatement (Second) of Conflict of Laws § 188(2). Here, the bills of lading were generated by TCTW and executed by the third-party truck drivers in Iowa; the contract was to be partially performed in Iowa; the shipments of hide trimmings were picked up in Iowa; and TCTW is domiciled in Iowa. There is no other state which has a clearly superior relationship to the controversy. Accordingly, the court shall apply Iowa law to the dispute.

organizational form. TCTW Resistance at 7. Midwest argues that each of the bills of lading in question "indicate[] that the origination of the shipment was with TCTW" and that TCTW is the consignor of the shipments under the statute. Midwest Resistance at 9. Midwest states that there is no dispute that the hides were indeed received from TCTW and from no other entity. *Id.* It argues that "[t]here is absolutely nothing in the record to indicate that any shipment originated from any entity called Twin City Tanning Company, LLP" or that "any so called entity 'Twin City Tanning Company[,] LLP' even exists and, if it does, [that] it has any interest in this litigation." *Id.* at 9-10.

Here, the bills of lading list the "Shipper" as "Twin City Tanning Co., LLP." *See* Midwest App'x at 47-100; Amended Complaint at 7-33. Despite TCTW's argument that "Twin City Tanning Co., LLP" is a separate legal entity, the court cannot say, as a matter of law, that TCTW is not the shipper in the instant action. There are no organizational documents for "Twin City Tanning Co., LLP" in the record, nor is there evidence that the shipments in question were actually shipped by or picked up from an entity doing business as "Twin City Tanning Co., LLP." Instead, as Midwest argues, the bills of lading identify the shipments as being received from "Twin City Tanning Waterloo, LLC" located in "Waterloo, IA 50703." *See* Midwest App'x at 47-100; Amended Complaint at 7-33. While it is odd that one portion of the bill of lading correctly identifies TCTW and another portion identifies a different entity, the court cannot definitively find that TCTW was not acting as the shipper. "Twin City Tanning Waterloo, LLC" and "Twin City Tanning Co, LLP" are quite similar in name and the bills of lading identify TCTW as the place of origination for the shipments of hide trimmings. Accordingly, summary judgment on this basis is inappropriate, and the court shall deny the TCTW Motion with respect to the argument that TCTW is not the shipper.

### 2.      Whether Midwest is the carrier

In the TCTW Resistance, TCTW argues that the court should deny the Midwest Motion because Midwest is not the carrier and has no standing to sue.  TCTW Resistance at 7.  TCTW argues that "Midwest's name appears nowhere on the bills of lading, they identify the trucking companies that actually hauled the trimmings as the carrier." *Id.* TCTW further argues that, because Midwest is not actually a party to the bills of lading, it is not in a position to assert contractual rights thereunder.  *Id.*  TCTW further disputes that Midwest has subrogation rights to sue TCTW simply because Midwest paid the third-party carriers, arguing that the contractual obligation to pay freight arose from a purported agreement between Midwest and Atlantic to pay the cost of shipping.  *Id.* at 8.  Finally, TCTW argues that the authority cited by Midwest is all distinguishable because, in those cases, the plaintiff was the delivering carrier of the goods whereas Midwest merely coordinated the shipment of the hide trimmings.  *Id.*  Midwest argues that, because it accepted responsibility for the transport of the goods, it is a "carrier" as defined by statute and can sue under the bills of lading.  Midwest Reply at 4.  It further argues that its status as a carrier is not dependent on Midwest's use of its own vehicles to transport the hide trimmings and that it can qualify as a carrier even if it simply makes shipping arrangements.  *Id.* at 5-6.

Initially, the court notes that the parties agree that bills of lading create contractual rights for the parties to the bills.  *See* Brief in Support of the Midwest Motion at 6; TCTW Resistance at 7.  Therefore, regardless of whether Midwest is considered a "carrier" under the statute, Midwest must be able to assert contractual rights pursuant to the bills of lading at issue to maintain the instant action, as TCTW argues.  *See, e.g.*, *Martin v. Peoples Mut. Sav. & Loan Ass'n*, 319 N.W.2d 220, 230 (Iowa 1982) (recognizing that, where persons not a party to a contract do not claim rights as third-party beneficiaries under the contract, they lack standing to challenge the contract).  Here, it appears that Midwest is not a direct

party to the bills of lading. Its name does not appear anywhere on the bills. Furthermore, the court cannot ascertain whether Midwest may be a party to the bills of lading based on their written terms due to the largely illegible nature of the copies of the bills of lading provided to the court. *See, e.g.*, *OneBeacon Ins. Co. v. Haas Indus., Inc.*, 634 F.3d 1092, 1098 (9th Cir. 2011) (holding that, where a bill of lading did not expressly state who may sue under it, a term in the bill which could be read to encompass a party not expressly named on the bill of lading gave such party the right to bring suit).

Although not addressed by the parties, it appears that Midwest is able to bring its claim under familiar principles of agency law. Because bills of lading are contracts, agency law as it relates to contracts applies. *See, e.g.*, *Midwest Trading Grp., Inc. v. GlobalTranz Enters., Inc.*, 59 F. Supp. 3d 887, 893 (N.D. Ill. 2014) (applying agency law to a bill of lading and finding an undisclosed principal, not a party to the bill of lading, able to sue). Iowa courts follow both the Restatement (Second) of Agency and the Restatement (Third) of Agency. *See Life Inv'rs Ins. Co. of Am. v. Estate of Corrado*, 838 N.W.2d 640, 646-47 (Iowa 2013) (abandoning the "purported to act" rule of ratification in the Restatement (Second) of Agency for the rule contained in the Restatement (Third) of Agency); *Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 523-24 (Iowa 2012) (citing the Restatement (Second) of Agency with approval). Under either Restatement, if an agent enters into a contract with a third party on behalf of an undisclosed principal, the principal is entitled to enforce contractual rights against such third party. *See* Restatement (Second) of Agency § 302 ("A person who makes a contract with an agent of an undisclosed principal . . . is liable to the principal as if the principal himself had made the contract with him . . . ."); Restatement (Third) of Agency § 6.03 ("When an agent acting with actual authority makes a contract on behalf of an undisclosed principal, . . . the principal, if a party to the contract, and the third party have the same rights, liabilities, and defenses against each other as if the principal made the contract personally . . . ."); *see also Iowa*

*Pub. Serv. Co. v. Med. Bow Coal Co.*, 556 F.2d 400, 406 n.6 (8th Cir. 1977) ("Iowa follows the general rule that an undisclosed principal can sue in his own name on a contract made on his behalf." (citing *Utils. Holding Corp. v. Chapman*, 232 N.W. 116 (1930)).

Here, it appears that the third-party trucking companies whose names appear on the bills of lading were acting as Midwest's agents by actually transporting the hide trimmings, of which Midwest itself accepted responsibility for transport. Midwest's 30(b)(6) representative, Warner, testified that, after Atlantic informed Midwest that a shipment of hide trimmings was ready to be picked up, Midwest dispatched and directed a third-party trucking company to haul the shipment. Midwest App'x at 9. The third-party companies then did, in fact, haul the hide trimmings to Kraft for each of the twenty-seven shipments in question. The evidence in the record points to the existence of a principal-agent relationship between Midwest and the third-party trucking companies, and the record is devoid of any evidence to the contrary. Therefore, under Iowa law, the fact that Midwest is not listed as a party to the bills of lading does not deprive it of the ability to sue thereunder as an undisclosed principal. Accordingly, insofar as TCTW seeks summary judgment on the grounds that Midwest is not the "carrier" under the bills of lading, the court shall deny the TCTW Motion.

### B. Bills of Lading as Freight Contracts

Midwest argues that the bills of lading operate as contracts, allocating liability for the cost of freight. Brief in Support of the Midwest Motion at 6. Midwest argues that the default presumption, that the shipper or consignor is primarily liable under the bills of lading, applies to the instant action because TCTW did not sign the nonrecourse provision on the bills in question. *Id.* at 7-8. Midwest further argues that, "[w]hen the delivering carrier arrived at Defendant's facility, and the Defendant released its freight to that carrier, it had an understanding that it was entering into a transaction with that delivering carrier

which it knew had been selected by Midwest." *Id.* at 9. Midwest contends that TCTW should be held to the bills of lading as drafted by TCTW. *Id.* at 10. According to Midwest, if TCTW wanted to absolve itself of liability under the bills, it should have simply signed the nonrecourse provision. *Id.*

TCTW primarily relies on its arguments that it is not the shipper and Midwest is not the carrier to attempt to avoid the presumption of liability. *See, e.g.*, TCTW Resistance at 7-9 (arguing that TCTW is not the shipper and that Midwest is not the carrier and that "even if Midwest were the carrier, the presumption of liability has been rebutted" (formatting omitted)); Brief in Support of the Midwest Motion at 12 (arguing that TCTW is not the shipper and that "even if the court finds that TCTW is the shipper, the presumption of liability has been irrefutably rebutted" (formatting omitted)). However, TCTW argues in passing that the bills of lading in the instant action functioned only as receipts and not as contracts. *See* Brief in Support of the TCTW Motion at 10-11.

In an affidavit, Lerner, on behalf of Atlantic, stated that "the purpose of the bills of lading was only to serve as a receipt, not to indicate responsibility for payment." TCTW App'x at 5. However, in his deposition, Lerner indicated that he had not been involved in the preparation of the bills of lading at issue and, in fact, is generally unfamiliar with them. *Id.* at 43 (Lerner testifying that his "only exposure to bills of lading generally" is with the bills of lading that Midwest would sometimes send with invoices to Atlantic). Despite the fact that "Lerner's testimony was based on his [twenty-five] years of experience purchasing and selling hide trimmings along with his . . . long-term business relationship with Midwest," TCTW Reply at 4, such testimony does not evince a deep understanding of the bills of lading at issue or the parties' understanding of them.

TCTW argues that Midwest, by its silence regarding the lack of TCTW's signature on the bills, demonstrated an understanding that they were to function as a receipt as well. Brief in Support of the TCTW Motion at 11. However, such speculation as to Midwest's

intent is forbidden at the summary judgment stage and does not provide the basis for summary disposition. *See Mann v. Yarnell*, 497 F.3d 822, 827 (8th Cir. 2007) (noting that the court will not "accept unreasonable inferences or sheer speculation as fact" (quoting *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004))). Accordingly, summary judgment on the basis that the bills operated as mere receipts is inappropriate. Furthermore, an understanding between the parties that the bills were to serve as receipts does not foreclose them from having legal effect as contracts. The law recognizes that bills of lading serve as both receipts and contracts of carriage. *See Kawasaki Kisen Kaisha Ltd.*, 561 U.S. at 94. Thus, a mutual understanding that the bills of lading were to serve as receipts does not necessarily mean that they cannot serve as contracts making TCTW liable for the cost of freight. Because there is an issue of material fact with respect to the parties' intent and understanding, summary judgment on this basis is inappropriate.[5]

Therefore, because TCTW and Midwest are bound to the rights and duties under the bills of lading and because TCTW failed to endorse the nonrecourse provision of the bills of lading, the court shall treat TCTW as presumptively liable for the freight charges

---

[5] Once evidence rebutting the presumption of liability arising out of the bills of lading is presented, the bills cease to operate as agreements allocating liability for freight costs and are rendered mere receipts. *See, e.g.*, *Greenstone Shipping Co., S.A. v. Transworld Oil, Ltd. of Hamilton, Berm.*, 588 F. Supp. 574, 579-80 (D. Del. 1984) (recognizing that bills of lading issued after a separate contract of carriage are merely receipts for goods (citing *Romano v. W. India Fruit & Steamship Co.*, 151 F.2d 727, 730 (5th Cir. 1945); *Unterweser Reederei Aktiengesellschaft v. Potash Imp. Corp.*, 36 F.2d 869, 870 (5th Cir. 1930)); *Vanlab Corp. v. Blossum Valley Foods Corp.*, No. 04-CV-6183, 2005 WL 43772, at *3 (W.D.N.Y. Jan. 10, 2005) ( "[A] bill of lading issued after the formation of a contract and not referred to in that contract serves only as a receipt for the transfer of the goods . . . .") (unpublished decision). Here, one of TCTW's main contentions is the existence of an agreement that Atlantic would be liable for freight charges. TCTW argues that Midwest's agreement with Atlantic rendered the bills of lading mere receipts. The court shall discuss the existence of such separate agreement below. Additionally, whether the bills of lading operated as receipts is a question of fact. Summary judgment on these grounds is inappropriate.

for the purpose of summary judgment. TCTW argues that, even if the presumption of liability attaches, it can rebut such presumption because TCTW did not have any beneficial interest in the hide trimmings, *i.e.*, the shipments were not made on behalf of TCTW, and because the parties agreed that Atlantic would be solely liable for the cost of freight. The court shall consider these arguments separately.

### 1. Thunderbird *and* Bestway

TCTW argues that *Thunderbird Motor Freight Lines, Inc. v. Seaman Timber Co.*, 734 F.2d 630 (11th Cir. 1984), controls the instant action and dictates that summary judgment in its favor is appropriate. Brief in Support of the TCTW Motion at 15-16. Midwest argues that *Thunderbird* is distinguishable from the instant action. Midwest Resistance at 15. Instead, Midwest argues that this case is more akin to *Bestway Sys., Inc. v. Gulf Forge Co.*, 100 F.3d 31 (5th Cir. 1996), and that summary judgment in its favor is appropriate. *Id.* at 15-17; Brief in Support of the Midwest Motion at 10-11.

In *Thunderbird*, the Eleventh Circuit Court of Appeals considered whether the seller of timber, Seaman, could be held liable for freight charges under bills of lading prepared by the carrier, Thunderbird, for shipment of the timber to the consignee, Rigdon. 734 F.2d at 631. Rigdon would purchase timber from Seaman and Thunderbird would "arrive unannounced at various unscheduled times at Seaman's place of business and request the lumber." *Id.* Seaman would help Thunderbird load the trucks for shipment, but that was the extent of Seaman's dealings with Thunderbird, as "Rigdon selected Thunderbird as the carrier and made all arrangements with Thunderbird concerning the times of shipment, destination, risk of loss, freight rate, and terms of payment." *Id.* Thunderbird introduced the bills of lading showing that Seaman failed to sign the nonrecourse provision. *Id.* However, the trial court also found that Thunderbird did not present the bills of lading to Seaman and Seaman was given no opportunity to state that it was familiar with all the

terms and conditions thereon. *Id.* The Eleventh Circuit found that there was no evidence from which a contract could be implied between Seaman and Thunderbird. *Id.* at 632.

The *Thunderbird* court focused on the fact that Seaman's only contact with Thunderbird was when it picked up the lumber at Seaman's place of business and that "there was no basis for a finding of an implied contract; therefore, the provisions of the uniform bill of lading and the statutory definitions to be used in interpreting that bill do not apply." *Id.* at 632-33. It also reasoned that the statutory definition of "consignor" was premised on the idea that the consignor was generally the party arranging for shipment. *Id.* at 632. The Eleventh Circuit found that, despite the statutory definition of "consignor," Seaman was not the consignor for purposes of the bills of lading—Rigdon was. *Id.* Instead, the lack of evidence "connecting Seaman to the transportation arrangements" was fatal to Thunderbird's case. *Id.* at 633.

In the instant action, unlike in *Thunderbird*, the bills of lading were prepared by TCTW. This fact renders the instant action similar to *Bestway v. Gulf Forge*, 100 F.3d at 33. In *Bestway*, the shipper sold steel ingots to the purchaser. *Id.* at 33. The purchaser contacted Bestway, the carrier, to haul the shipments. *Id.* The shipper and Bestway had no contact besides Bestway picking up the shipments. *Id.* Additionally, unlike in *Thunderbird* and similar to the instant action, the shipper provided and executed bills of lading to Bestway for the shipments. *Id.* None of the bills of lading in *Bestway* had an endorsed nonrecourse provision, *id.* at 33-34, and the shipper refused to pay for freight under the bills of lading, citing *Thunderbird*, *see id.* at 32 n.1. Ultimately, the Fifth Circuit Court of Appeals found that the shipper was liable for the freight charges. *Id.* at 34. The Fifth Circuit distinguished *Thunderbird* by noting that, in *Thunderbird*, "the shipper did not sign or adopt any bill of lading, and there was no other contract between the shipper and the carrier." *Id.* at 32 n.1. TCTW argues that this distinction renders *Thunderbird* controlling. *See* Brief in Support of the TCTW Motion at 18. It also

distinguishes *Bestway* because, unlike the shipper's admitted interest in the steel ingots, TCTW disclaims any legal or beneficial interest in the hide trimmings. *Id.*

The court finds that neither *Thunderbird* nor *Bestway* is controlling as a matter of law in the instant action. However, the court finds that the facts of *Bestway* are more analogous to the instant action. Although TCTW never negotiated with Midwest regarding shipment of the hide trimmings, like in *Thunderbird*, TCTW actually drafted and provided the bills of lading to Midwest, like in *Bestway*. This distinction is legally relevant and TCTW's argument that it did not sign the bills of lading and its reliance on *Thunderbird* as construed in *Bestway* is misplaced. The *Bestway* court clearly contemplated that a party could adopt the bills of lading and thereby be bound by them. *See Bestway*, 100 F.3d at 32 n.1 (noting that there was no evidence that the shipper in *Thunderbird* "sign[ed] or adopt[ed]" the bills of lading). In *Thunderbird*, the Eleventh Circuit found that there was no evidence from which the court could infer a contract where Seaman did not, "for example, . . . mak[e] the contractual arrangements." *Thunderbird*, 734 F.3d at 632. Here, TCTW drafted the bills of lading and provided them to the third-party truck drivers. On those facts, a reasonable jury could infer a contract. Additionally, the court has found no authority to suggest that Iowa courts would define "consignor" as broadly as the Eleventh Circuit, which found Rigdon was the consignor, despite not fitting the statutory definition. Neither party has argued whether TCTW's drafting of the bills of lading constituted an adoption of them. But, at the very least, the fact that TCTW itself issued the bills of lading and was in control of the terms thereof distinguishes the instant action from both *Thunderbird* and *Bestway*, and the court finds that summary judgment in favor of either party is inappropriate.

### 2. *TCTW's interest in the hide trimmings*

TCTW argues that "the shipments were not made on behalf of TCTW[;] TCTW did not have a beneficial interest in the trimmings." Brief in Support of the TCTW Motion

at 15 (formatting omitted). TCTW argues that this prevents Midwest from prevailing against it. *Id.* at 16. TCTW maintains that the hides "were owned by Atlantic and the shipments were made on behalf of Atlantic."[6] *Id.*; *see also Bestway*, 100 F.3d at 34 (recognizing that the presumption that the shipper is the consignor and that the consignor is liable for the cost of shipping may be rebutted by "facts and documents which indicate another has the true beneficial interest in the goods being shipped"). Midwest argues that "there was no way for Midwest to know that TCTW did not have an interest in the hide trimmings . . . ." Midwest Resistance at 15. The court agrees.

As the court previously noted, in *Louisville & Nashville R.R. Co. v Central Iron & Coal Co.*, the Supreme Court stated that a consignor may escape liability under the bills of lading by demonstrating "that the shipper of the goods was not acting on his own behalf" and "that this fact was known by the carrier." 265 U.S. at 67. Here, there is no evidence that Midwest knew that TCTW did not have any interest in the hide trimmings. The bills of lading identify TCTW as the party originating the shipment and the shipments were picked up from TCTW. *See* Midwest App'x at 47-100; Amended Complaint at 7-33. Furthermore, the nature of the goods being shipped would not have placed Midwest on notice that TCTW had no interest in the trimmings. Midwest was hired to ship hide trimmings and TCTW is a tanning company—nothing about the nature of the goods and TCTW's business should have alerted Midwest to the fact that TCTW had no interest in the trimmings. TCTW does not become entitled to summary judgment by disclaiming any sort of interest in the hide trimmings as a matter of fact; the proper consideration is whether the carrier knew of this fact. Here, because there is no indication that Midwest

---

[6] Midwest does not appear to dispute that TCTW did not, in fact, have any interest in the hide trimmings. *See* Midwest Resistance at 14-16. However, for the reasons stated below, the court need not address which party had an interest in them before and during transit. Accordingly, the court shall not decide whether TCTW had an interest in the hide trimmings in question.

knew that TCTW did not have an interest in the hide trimmings, the court shall deny the TCTW Motion to the extent it argues the same.

### 3. *Atlantic's purported agreement to pay*

TCTW argues that the court should grant summary judgment in its favor because, "[t]hroughout the entire time that Midwest worked with Atlantic, all of the parties agreed and understood that Atlantic was [solely] responsible for [the] shipping bills in dispute." Brief in Support of the TCTW Motion at 13. Midwest argues that the parties never agreed that Atlantic would be solely liable for the shipping costs. Midwest Resistance at 12. Midwest argues that, even if it anticipated that Atlantic would pay the cost of shipping, any agreement between Midwest and Atlantic did not expressly absolve TCTW of liability in the event that Atlantic failed to pay. *Id.*

As the court has previously noted, the presumption that the shipper is primarily liable for the cost of freight may be rebutted by evidence "that the parties intended not only that the consignee should assume an obligation to pay the freight charges, but that the shipper should not assume any liability whatsoever therefor . . . ." *Louisville & Nashville R.R. Co.*, 265 U.S. at 67-68. In particular, the default liability provisions in a bill of lading "can be modified by contract so as to make 'the liability allocation presumptions on the bill of lading . . . unnecessary.'" *Oak Harbor*, 513 F.3d at 955 (quoting *C.A.R. Transp. Brokerage Co.*, 213 F.3d at 479). "For example, if the parties enter into a contract before preparing a bill of lading, and there is 'an irreconcilable repugnancy between the prior written contract and the bills of lading, that conflict would have to be resolved in favor of the former.'" *Id.* (quoting *Toyo Kisen Kaisha v. W.R. Grace & Co.*, 53 F.2d 740, 742 (9th Cir. 1931)). However, where no "irreconcilable repugnancy" exists between an earlier contract and the provisions in the bills of lading, the two "operate concurrently and in harmony to provide the key terms" for the agreement between the parties. *Id.* at 957.

In his deposition, Warner testified that "[t]here was an agreement between Atlantic Trading and Midwest Direct Logistics that Atlantic Trading would pay for the shipments from Waterloo out to Massachusetts . . . ." TCTW App'x at 16. He also testified that, during the long relationship between Atlantic and Midwest, this had always been the practice between the parties. *Id.* at 16, 18 (Warner testifying that it was Midwest's practice to bill Atlantic for the shipments and that Atlantic would pay). Warner also testified as follows:

> Q. Do you agree that Twin City Tanning Waterloo was never involved in the price negotiations?
>
> A. Correct.
>
> Q. And do you agreement that Twin City Tanning was never part of the payment stream?
>
> A. Yes.
>
> Q. And do you agree [t]hat when Atlantic Trading fell behind on its payments, Midwest Direct sought payment directly from Atlantic Trading?
>
> A. Yes.

*Id.* at 18. Warner admitted that, until Midwest turned its account with Atlantic over to collections, it did not investigate the bills of lading to investigate whether TCTW would be liable for the shipments. *Id.* at 30. He further admitted that he did not contact TCTW prior to looking at the bills of lading because he did not expect that TCTW would have to pay. *Id.*

Lerner did not assert that there was any actual agreement between Atlantic and Midwest regarding who would pay freight costs, but also stated that he did not "think there was any question that [Atlantic] would have paid for" the shipments in question. *Id.* at 37. He also opined that TCTW was "not responsible" and was "never responsible" for the charges. *Id.* In support of his opinions, Lerner stated that he "was giving the order to pick [the shipments] up." *Id.* at 38. Lerner testified as follows:

24

> Q. And to your knowledge, do you know whether Twin City Tanning ever paid or agreed that they should pay for the billing?
>
> A. No. They never paid because they never got any invoices.
>
> Q. And they never got any invoices because?
>
> A. Because they were coming to me. I was the company—Atlantic Trading was the one receiving the bills.

*Id.* However, Lerner admitted that there was never any written agreement that indicated that Atlantic would assume sole or even primary liability for the shipments. *Id.* at 46. Lerner also stated the following:

> Q. Are you claiming that there was a specific agreement between Atlantic Trading and Midwest that Twin City would not be expected or required to pay the shipping costs?
>
> . . .
>
> A. It was never discussed. It was assumed from the beginning that I would be ordering the trucks and I would be responsible.
>
> . . .
>
> Q. Let's just make sure that I'm correct on this Mr. Lerner. Was there a written or a verbal agreement between Atlantic Trading and Midwest that Twin City would not be expected or required to pay for the shipping costs or was that something that you assumed?
>
> A. We never discussed it.
>
> Q. Was that something you assumed?
>
> A. Well, if I'm being billed, I guess, yes. Yeah.

*Id.*

On December 29, 2013, a representative from Midwest sent an email to Lerner at Atlantic requesting information about payment. *See* Midwest App'x at 17-18. Midwest stated that, if Atlantic did not remit payment soon, it would "begin billing the shipper as well as Kraft Foods for all outstanding invoices." *Id.* at 18. Lerner replied that he was "responsible for the shipping not [Kraft] nor the shippers." *Id.* at 17.

There is ample evidence in the record to establish that Atlantic undertook some form of responsibility to pay for the shipments. The parties are in agreement that Atlantic was responsible for the coordination of the shipments. Atlantic was consistently billed for the cost of shipments, did not object to being billed for the shipments and consistently paid for the shipments until it foundered in the squalls of financial trouble. However, the lack of a written agreement, and the discrepancy between Warner and Lerner's deposition testimony regarding whether any explicit agreement was actually reached between Atlantic and Midwest, gives the court pause. The email between Midwest and Lerner suggests that, at the very least, Midwest believed in December of 2013 that it had recourse against TCTW. This raises the question of whether Atlantic ever agreed to be solely liable for the cost of shipping. The mere fact that Warner did not expect to be able to collect from TCTW until examining the bills of lading does not establish, as a matter of law, that Atlantic undertook sole responsibility for the payment of freight. Thus, though a close call, the court finds that there is a genuine dispute regarding whether Atlantic and Midwest reached an agreement that Atlantic would be solely liable for the shipments. Accordingly, the court shall deny the TCTW Motion and the Midwest Motion with respect to this issue.[7]

---

[7] The court further notes that neither party explicitly addresses the second count of the Amended Complaint—the action on implied contract. Accordingly, the court is not in a position to grant summary disposition in favor of either party on Count II. Insofar as the Midwest Motion or TCTW Motion seek summary judgment on Count II, the court shall deny it.

### C.  Equitable Estoppel

TCTW also argues that Midwest is estopped from enforcing any rights it may have under the bills of lading because of conduct inconsistent with the existence of TCTW's liability.  *See* Brief in Support of the TCTW Motion at 19.  TCTW argues that, "[u]nderstanding that Atlantic owed for the ever-increasing back shipping fees, Midwest (1) never billed TCTW, (2) never notified TCTW of the amount of shipping due, and (3) never told TCTW that the payments were late or growing."  *Id*.  TCTW also argues that Midwest cannot choose to pursue Atlantic for payment and then sue TCTW when Atlantic ultimately failed to pay, especially after Atlantic provided assurances that it bore the responsibility for payment.  *See* TCTW Reply at 2.  It also argues that "Midwest cannot, as a matter of law, choose to keep TCTW in the dark while it allows a debt to escalate only later to turn around to sue TCTW to collect on that same debt."  Brief in Support of the TCTW Motion at 19.  TCTW contends that, had Midwest told it of Atlantic's mounting debt, "immediate steps would have been taken to protect TCTW."  TCTW Reply at 3.

Midwest argues that, because TCTW did not rely on any misrepresentation made by Midwest, it cannot advance an estoppel theory.  Midwest Resistance at 17.  Midwest distinguishes the instant action from so-called "double payment" cases in which an innocent party is asked to pay for shipping twice.  *Id*. at 18.  Midwest also argues that its failure to earlier assert claims under the bills of lading is not dispositive, and the fact that it billed and sought payment from Atlantic prior to filing the instant action is not inconsistent with holding TCTW liable under the bills of lading.  *Id*. at 18-19.  In reply, TCTW asserts that estoppel need not arise out of an affirmative misrepresentation, but may arise from the concealment of a material fact as well.  TCTW Reply at 3.

Iowa courts "recognize the doctrine of equitable estoppel in contract law." *Margeson v. Artis*, 776 N.W.2d 652, 659 (Iowa 2009).  "Equitable estoppel is a doctrine based on fair dealing, good faith, and justice."  In re *Marriage of Halvorsen*, 521 N.W.2d

725, 728 (Iowa 1994). "Under this doctrine, the parties to a valid contract may estop themselves from asserting any right under the contract by conduct inconsistent with the continued existence of the original contract." *Margeson*, 776 N.W.2d at 659 (quotation marks omitted) (quoting *Recker v. Gustafson*, 279 N.W.2d 744, 755 (Iowa 1979)). In determining whether equitable estoppel is appropriate, courts may consider both "the acts of the parties and the contract itself." *Id.* A party attempting to establish that equitable estoppel applies must prove that: (1) the opposing party made a false representation or concealed a material fact; (2) the party asserting estoppel lacked knowledge of the true facts; (3) the opposing party intended the party asserting estoppel to act upon such representation or concealment; and (4) the party asserting estoppel did in fact rely on such representation and suffered prejudice. *See McKee v. Isle of Capri Casinos, Inc.*, 864 N.W.2d 518, 531 (Iowa 2015). Under Iowa law, whether the defense of equitable estoppel applies is generally a question of fact. *See Severson v. Elberon Elevator, Inc.*, 250 N.W.2d 417, 421-22 (Iowa 1977) ("When the evidence [regarding equitable estoppel] is susceptible to differing inferences, the issue whether the claim has been proven is for the trier of fact."). "The burden of proving estoppel is on the party asserting it; strict proof of all elements is demanded." *Pillsbury Co. v. Ward*, 250 N.W.2d 35, 39 (Iowa 1977).

Neither party has cited authority directly on point and the court has found none. However, in *Olson Distributing Systems, Inc. v. Glasurit America, Inc.*, the Sixth Circuit Court of Appeals considered arguments similar to those raised by TCTW in the instant action. 850 F.2d 295 (1988). In *Olson*, the Sixth Circuit was asked whether, after a freight forwarder absconded with monies paid to it by the shipper without paying the carrier, the carrier should be equitably estopped from pursuing a claim against the shipper. *Olson*, 850 F.2d at 296. The Sixth Circuit determined that the carrier should be estopped from proceeding against the shipper. *Id.* at 297. The *Olson* court focused on the fact that the shipper paid the freight fowarder once for all of the carrier's charges, and the carrier's

"documents and actions" gave the shipper the "clear impression" that the carrier was receiving payments from the freight forwarder. *Id.* The carrier routinely prepared delivery receipts directing the shipper to bill the freight forwarder. *Id.* The Sixth Circuit also focused on the carrier's failure to inform the shipper of the freight forwarder's nonpayment. *Id.* "This unexplained failure to notify [the shipper] resulted in the escalation of the loss." *Id.* The Sixth Circuit pointed out that, had the carrier informed the shipper of the freight forwarder's failure to pay the carrier earlier, the shipper could have paid the carrier directly and mitigated the carrier's damages. *Id.*

Here, while it is perhaps true that TCTW would have been able to protect itself had Midwest informed TCTW that it was not being paid by Atlantic, there were no affirmative misrepresentations or purposeful concealments meant to lull TCTW into believing Midwest was being paid. TCTW argues that Midwest "concealed the increasing debt from TCTW because it did not want to go behind Atlantic's back and disrupt the shipments." TCTW Reply at 3; *see also* TCTW App'x at 26 (Warner testifying that he did not notify TCTW of Atlantic's mounting debt because he "didn't feel it was [his] responsibility to go behind [Lerner's] back and tell his customers his problems"). However, such conduct alone is insufficient to find that Midwest is estopped from bringing its claim as a matter of law. Unlike in *Olson*, Midwest gave no actual indication that it was being paid and did not lull TCTW into believing that everything was operating normally. Even if such a concealment could form the basis for an estoppel defense, whether Midwest intended TCTW to rely on such concealment is a question of fact unsuitable for summary judgment.

Additionally, merely because Midwest sought payment from Atlantic before it sought payment from TCTW is not a basis for equitable estoppel. Unendorsed bills of lading make both the consignor and consignee liable for freight charges. *See Oak Harbor*, 513 F.3d at 955 (recognizing that, unless the nonrecourse provision on the bill of lading is checked, the shipper is liable for freight charges and, unless the prepaid provision on

the bill of lading is checked, the consignee is liable for freight charges). The court is unconvinced that Midwest's attempt to collect from Atlantic before turning to TCTW is actually inconsistent with the terms of the bills of lading. Furthermore, any inconsistency between Midwest's actions and liability as assigned in the bills of lading does not rise to such a level as to make it fundamentally inequitable to allow Midwest to bring its claim.

Finally, the court notes that this is not the typical case in which equitable estoppel is applied in relation to liability for freight charges. Equitable estoppel is normally raised as a defense in cases in which an innocent party would be asked to pay twice for the same shipments. *See S. Pac. Transp. Co.*, 456 U.S. at 351 (recognizing that double payment cases "constitute their own category and stand against the placement of duplication of liability upon an innocent party"); *see also Inman Freight Sys., Inc. v. Olin Corp.*, 807 F.2d 117, 121 (8th Cir. 1986) ("A carrier may be estopped from collecting freight charges when the consignee relies on a misrepresentation and is asked to pay double the applicable charges."). In both *Southern Pacific* and *Inman Freights*, courts recognized that the carrier had not yet been paid for its services and refused to apply principles of equitable estoppel to bar the claims. *S. Pac. Transp. Co.*, 456 U.S. at 351; *Inman Freight Sys.*, 807 F.2d at 121. Here, Midwest has not yet been paid and TCTW is not placed in the position of potentially paying twice for freight on the same shipments. This fact further weighs against application of equitable estoppel at this stage. Therefore, the court shall deny the TCTW Motion with regard to TCTW's equitable estoppel argument.[8]

---

[8] TCTW also states that "Midwest's claims should . . . be dismissed under the doctrine of waiver, which also functions as an affirmative defense" to a breach of contract claim. Brief in Support of the TCTW Motion at 19 (citing *Travelers Indemnity Co. v. Fields*, 317 N.W.2d 176, 186 (Iowa 1982)). However, TCTW makes no further argument on its waiver defense. Insofar as TCTW seeks summary judgment on its defense of waiver, the court shall deny the TCTW Motion.

### VII.  CONCLUSION

In light of the foregoing, it is hereby **ORDERED**:

(1) The Midwest Motion (docket no. 35) is **DENIED**; and

(2) The TCTW Motion (docket no. 36) is **DENIED**.

Both counts of the Amended Complaint shall proceed to trial.  The final pretrial conference in the instant action is scheduled for Thursday, August 18, 2016 at 4:00 p.m.

**IT IS SO ORDERED.**

**DATED** this 26th day of July, 2016.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA